NOT DESIGNATED FOR PUBLICATION

No. 116,193

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MAUREEN HARDEN HERD and
THE ESTATE OF HERN J. HERD, Deceased,
By and Through Special Administrator, STAN HERD,
*Appellants*,

v.

SHRAUNER FEEDYARD, LLC,
*Appellee*.

MEMORANDUM OPINION

Appeal from Comanche District Court; VAN Z. HAMPTON, judge. Opinion filed June 16, 2017. Affirmed.

*Robert V. Eye*, of Robert V. Eye Law Office, LLC, of Lawrence, and *Charles H. Herd*, of Coldwater, for appellants.

*James D. Oliver*, of Foulston Siefkin LLP, of Overland Park, and *David M. Traster* and *Daniel J. Buller*, of the same firm, of Wichita, for appellee.

Before ATCHESON, P.J., MALONE and POWELL, JJ.

MALONE, J.:  Shrauner Feedyard, LLC (Shrauner), operates a cattle-feeding facility near Protection, Kansas. Maureen Harden Herd owns a home near Shrauner's facility. In 2012, Shrauner applied for and received a permit from the Kansas Department of Health and Environment (KDHE) to expand its facility to 2,000 head of cattle and to build a water pollution control system. Although Herd filed an administrative action to challenge the KDHE permit, she subsequently abandoned her petition for judicial review.

1

Instead, Herd filed a separate lawsuit directly against Shrauner seeking declaratory and injunctive relief, claiming that Shrauner's 2012 expansion violated the separation distance requirements between a confined feeding facility and the nearest habitable structure set forth in K.S.A. 2016 Supp. 65-171d(j)(1); Herd also included a nuisance action on behalf of her late husband Hern's estate (the Estate), claiming that the expansion of Shrauner's facility interfered with Hern's burial site in the Protection Township Cemetery.

The district court granted Shrauner's motion for summary judgment, finding that Shrauner's 2012 expansion was exempt from the separation distance requirements under all three exceptions set forth in K.S.A. 2016 Supp. 65-171d(l)(1). The district court also ruled that the Estate's nuisance action failed as a matter of law. Herd timely appealed. Although we question our court's jurisdiction to review any claims for relief directly against Shrauner except for the Estate's nuisance claims, for the reasons set forth herein, we affirm the district court's summary judgment against Herd and the Estate on all issues.

FACTUAL AND PROCEDURAL BACKGROUND

Herd owns a parcel of land in the southeast quarter of section 32 of Protection Township in Comanche County, Kansas. This parcel of land has been in Herd's family since her grandfather purchased it in 1925; in 1950, the family built a farm house on the land, which is currently occupied by Herd's son and daughter-in-law.

Shrauner owns approximately 310 acres of land in section 33 of Protection Township, which it uses to operate a commercial feedyard located directly northeast of Herd's property. Shrauner has cattle-feeding facilities on the northeast and northwest quarters of section 33. The Herd residence is located approximately 2,567 feet from Shrauner's closest pens, which are situated on the southwest corner of the facility.

K.S.A. 2016 Supp. 65-171d(g) requires any confined feeding facility with 300 or more head of cattle to register with the KDHE. Upon registration, KDHE shall identify any "significant water pollution potential or separation distance violations." K.S.A. 2016 Supp. 65-171d(g)(3). If KDHE identifies any significant water pollution potential, the facility shall be required to obtain a permit from the secretary. K.S.A. 2016 Supp. 171d(g)(3)(A)(i). If KDHE finds no significant water pollution potential or separation distance violations, the secretary shall certify the registration. K.S.A. 2016 Supp. 65-171d(g)(3)(B)(i). Bluff Creek runs through parts of Comanche County and is located about 2,500 feet south of Shrauner's facilities. KDHE must ensure that Shrauner's cattle-feeding operation will not cause a water pollution problem to Bluff Creek.

In 1987, pursuant to K.S.A. 1987 Supp. 65-171d, Shrauner filed a registration application with the KDHE for a 950-head cattle feeding facility on its property in the northwest quarter of section 33. The sketch of the proposed facility submitted with the application showed that the facility would be in the east half of the northwest quarter of section 33 and would be comprised of cattle pens running in the north-south direction (south pens). KDHE approved the plans on December 16, 1987, and informed Shrauner that water pollution controls were not necessary because any runoff from the facility would be dispersed over Shrauner's cropland and would not discharge into Bluff Creek.

In 1988, KDHE issued a Certification of Compliance to Shrauner for a 1,500-head feeding facility; however, the facility description stated that the south pens were in the northeast quarter of section 33, rather than their actual location in the northwest quarter of section 33. Shrauner never sought review of the KDHE's Certification of Compliance and the apparent error in the facility's legal description.

In 1990, Shrauner wished to expand its facility and filed a registration and permit application with KDHE for the construction of four cattle pens east of the original north-south pens; these new pens would run in the east-west direction (east pens). Shrauner also

3

sought approval to increase its capacity from 1,500 to 2,000 head of cattle. The application included a diagram of the existing south pens and the proposed addition of the east pens. The application also showed that even with the addition of the east pens, the south pens built in 1987 remained the facility closest to the Herd residence.

KDHE approved Shrauner's application for the east pens on May 15, 1990. On May 16, 1990, KDHE wrote to Shrauner stating:  "We have reviewed and approved the plans and specifications for the livestock waste control system to serve your 500 head expansion at your beef feeding operation. . . . Your wastewater control permit is being updated to reflect the expansion." KDHE prepared a Certification of Compliance for the 1990 addition of the east pens but neglected to sign it and again mistakenly described the south pens as being in the northeast quarter of section 33.

In 1998, KDHE issued a Certification of Compliance to Shrauner for a 950-animal unit facility, apparently due to KDHE's belief that because of a change in K.S.A. 65-171d, a cattle-feeding facility's capacity was to be determined by counting each head of cattle as one animal unit, as opposed to the traditional state law method where the size of the animal is considered in determining the maximum number of cattle that a facility could accommodate. The 1998 Certification of Compliance again described the facility as being in the northeast quarter of section 33, rather than the northwest quarter. The Certification of Compliance also noted that the facility was not a significant water pollution threat. Again, Shrauner did not challenge KDHE's apparent mistake in the legal description of the facility. Shrauner complied with the 1998 Certification of Compliance and depopulated its facility to 950 head of cattle.

In 2012, Shrauner wanted to expand its capacity from the 950 maximum provided for in the 1998 Certification of Compliance to 2,000 head of cattle; this necessitated obtaining a federal National Pollutant Discharge Elimination System (NPDES) permit and developing adequate water pollution controls to support the increase in the number of

4

cattle at the facility. Shrauner applied to KDHE for the NPDES permit; Shrauner also proposed that it would build a runoff water drainage system with a waste storage pond on the east edge of the facility and a runoff diversion channel running along the facility's southern boundary; the runoff diversion channel would catch runoff water from the feedlots and direct it to the storage pond. According to Shrauner's application, the distance between the facility and the Herd residence would not decrease due to the proposed additions of the water pollution control structures; the facility closest to the Hern residence would still be the south pens built in 1987.

Before approving Shrauner's application for the 2012 expansion, KDHE had to determine whether the separation distance requirements of K.S.A. 2016 Supp. 65-171d(j)(1) applied to the facility and whether any of the statutory exceptions applied. KDHE acknowledged that its previous legal description of the south pens as being in the northeast quarter in Shrauner's Certifications of Compliance was a clerical error. KDHE ultimately determined that the 2012 expansion did not violate the separation distance requirements of K.S.A. 2016 Supp. 65-171d(j)(1) and instead fell within one of the exceptions. Referring to the south pens built in 1987, KDHE explained:

> "KDHE acknowledges that the previous Certification of Compliance incorrectly lists the legal description of the facility as the Northeast Quarter of Section 33. There is clear documentation that the facility, which is located in the East Half of the Northwest Quarter and the Southwest Quarter of the Northeast Quarter of Section 33, existed on July 1, 1994. The proposed expansion does not encroach on the applicable separation distance . . . from the facility footprint to the nearest habitable structure. Therefore, the expanding facility meets the statutory separation distance requirement."

On November 19, 2012, Herd filed a petition in the Comanche County District Court for judicial review of KDHE's decision to grant the permit for Shrauner's 2012 expansion under the Kansas Judicial Review Act (KJRA). *Herd v. Kansas Dept. of Health & Environment*, No. 110,552, 2014 WL 2747718, at *1 (Kan. App. 2014)

(unpublished opinion). Herd contested KDHE's finding that Shrauner was exempt from the statutory separation distance requirements. After a hearing, the district court granted KDHE's motion to dismiss based on Herd's lack of standing. Herd appealed and this court reversed the district court's dismissal of the KJRA action, holding that "Herd's alleged concerns were sufficient to establish an injury related to the alleged adverse effects of the expanded feedlot. Thus, Herd met her burden to establish traditional standing." 2014 WL 2747718, at *6.

Rather than pursue her claim against KDHE—which is still pending in the district court—Herd instead filed a separate petition in the Comanche County District Court for declaratory and injunctive relief against Shrauner on May 5, 2014. In the petition, Herd claimed that Shrauner's 2012 expansion violated the separation distance requirements of K.S.A. 2016 Supp. 65-171d(j)(1) and did not fall within any of the statutory exceptions. Herd also included a nuisance claim against Shrauner on behalf of her late husband's estate, claiming that the 2012 expansion of the facility interfered with his burial site in the Protection Township Cemetery, which is located southeast of Shrauner's facility. Specifically, Herd claimed that the waste storage pond "produce[d] stench, odor and breeding ground for mosquitoes and other insects" and the expansion of the facility "obstruct[ed] the reasonable and comfortable use of the cemetery."

On May 15, 2015, Herd filed a motion for summary judgment claiming that based on the undisputed facts, Shrauner's 2012 expansion violated the separation distance requirements in K.S.A. 2016 Supp. 65-171d(j)(1) and did not fall within any statutory exception. Shrauner filed a cross-motion for summary judgment, alleging that the undisputed facts established that the facility's expansion was exempt from the separation distance requirements based on the three exceptions set forth in K.S.A. 2016 Supp. 65-171d(l)(1). Shrauner also claimed that the Estate's nuisance claim failed as a matter of law because the alleged harm was not to any property owned by the Estate and because the alleged harm was not distinguishable from any harm sustained by the general public.

6

In an order filed on July 15, 2016, the district court denied Herd's motion for summary judgment and granted Shrauner's cross-motion for summary judgment. The district court found that based on the uncontroverted facts, all three exceptions to the separation distance requirements applied to Shrauner's facility. Specifically, the district court concluded that (1) the facility was permitted or certified on July 1, 1994; (2) the facility existed on July 1, 1994, and was registered before July 1, 1996—and the Certification of Compliance describing the facility as being in the northeast quarter instead of the northwest quarter was a harmless clerical error; and (3) the facility existed on July 1, 1994, and the 2012 expansion did not bring the facility closer to the Herd residence. The district court also found that the Estate's nuisance claim failed as a matter of law. The district court explained that because the cemetery is a public place, the Estate could only bring a public nuisance claim; however, a public nuisance claim failed because the Estate was not alleging any harm caused by Shrauner's 2012 expansion that was distinguishable from the harm caused to the general public.

On appeal, Herd claims the district court erred in denying its motion for summary judgment and in granting Shrauner's cross-motion for summary judgment. Herd makes various arguments that Shrauner's 2012 expansion violated the separation distance requirements between a confined feeding facility and the nearest habitable structure set forth in K.S.A. 2016 Supp. 65-171d(j)(1), and Herd argues that none of the statutory exceptions to the separation distance requirements apply to Shrauner's facility. Herd also argues that the district court erred when it ruled that the Estate's nuisance claim concerning the cemetery failed as a matter of law.

Shrauner challenges whether Herd can bring a direct lawsuit against Shrauner for declaratory and injunctive relief arising from KDHE's decision to permit the 2012 expansion of its facility. As to the merits of Herd's claims, Shrauner argues that the 2012 expansion of its facility was exempt from the statutory separation distance requirements under all three exceptions set forth in K.S.A. 2016 Supp. 65-171d(l)(1). Shrauner also

7

argues that the district court correctly ruled that the Estate's nuisance claims failed as a matter of law because the Estate had no property interest in Hern's burial site upon which to bring a nuisance claim and because the Estate was not alleging any harm caused by the 2012 expansion that was distinguishable from the harm caused to the general public.

The standard for granting a summary judgment, including the standard of review on appeal, is well known:

> "'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may be reasonably drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' [Citations omitted.]" *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 962, 298 P.3d 250 (2013).

## CAN HERD BRING A DIRECT LAWSUIT AGAINST SHRAUNER INSTEAD OF PURSUING HER PETITION FOR JUDICIAL REVIEW UNDER THE KJRA?

Prior to reaching the merits of Herd's arguments on appeal, we must first resolve the potential jurisdictional issue presented in this case. Shrauner notes that the issue in this appeal—namely whether the 2012 expansion of the feedyard operation was exempt from the separation distance requirements of K.S.A. 2016 Supp. 65-171d(j)(1)—was already decided by KDHE's final administrative action granting Shrauner's permit to expand its facility in 2012. Shrauner argues that this lawsuit is really a challenge to KDHE's administrative order granting the permit and review of KDHE's actions can only

occur under the KJRA. Thus, Shrauner contends, "this court's jurisdiction is limited to consideration of facts, legal arguments, and remedies not involving any collateral attack on the administrative agency's proceedings."

In her reply brief, Herd claims that Shrauner's argument is a "new affirmative defense not pled in Shrauner's answer or presented in [its] summary judgment motion response" and is therefore waived. Alternatively, Herd claims that *Nora H. Ringler Revocable Family Trust v. Meyer Land and Cattle Co.*, 25 Kan. App. 2d 122, 131-32, 958 P.2d 1162, *rev. denied* 265 Kan. 886 (1998), "recognized a private cause of action to enforce statutory separation distances that can be prosecuted independent of KJRA relief."

Contrary to Herd's assertion that Shrauner is raising a new affirmative defense that it waived in district court, Shrauner's claim presents a jurisdictional issue that this court may consider for the first time on appeal. An appellate court has a duty to question jurisdiction *sua sponte*. If the record shows a lack of jurisdiction, the court must dismiss the appeal. *Kaelter v. Sokol*, 301 Kan. 247, Syl. ¶ 1, 340 P.3d 1210 (2015). The right to appeal is entirely statutory and subject to certain exceptions; Kansas appellate courts have jurisdiction to entertain an appeal only if the appeal is taken in the manner prescribed by statute. *Harsch v. Miller*, 288 Kan. 280, 287, 200 P.3d 467 (2007).

The law in Kansas is clear that a party challenging an administrative order must exhaust all administrative remedies before seeking judicial review of the agency's action. K.S.A. 2016 Supp. 77-612; *Cochran v. Kansas Dept. of Agriculture*, 291 Kan. 898, 908, 249 P.3d 434 (2011). Thus, to challenge KDHE's decision to grant the permit for Shrauner's 2012 expansion, Herd was required to exhaust her administrative remedies. After doing so, Herd was entitled to file a petition for judicial review under the KJRA.

9

Herd initially filed a petition for judicial review of KDHE's decision to grant the permit for Shrauner's 2012 expansion. In fact, Herd successfully appealed the district court's decision to dismiss that action based on KDHE's claim that Herd lacked standing. But instead of attempting to obtain her desired relief under the KJRA—which is to challenge the 2012 expansion permit granted by KDHE—Herd abandoned her KJRA suit and brought a direct action against Shrauner seeking declaratory and injunctive relief.

Herd claims that *Ringler* permits her to bring a direct suit against Shrauner without exhausting her administrative remedies under the KJRA. In that case, Ringler sought to enjoin Meyer Land and Cattle Co. (Meyer) from expanding its livestock feeding facility, which was located near a dwelling on Ringler's property. In 1992, KDHE issued Meyer a 5-year permit for 10 feeding pens with a capacity of 1,000 head of cattle. Ringler sought revocation of Meyer's permit from KDHE because of inaccuracies in Meyer's permit application, which stated that the nearest dwelling to its facility was 1/2 mile away when in reality the dwelling owned by Ringler was only 50 feet away from the facility. The KDHE presiding officer agreed and revoked Meyer's permit in 1994. The presiding officer reasoned that the statutory separation distance requirements mandated a 1,320-foot buffer zone between the dwelling and the feedlot facilities. 25 Kan. App. 2d at 123-24.

The KDHE adopted most of the presiding officer's findings but found that Meyer's facility was exempt from the separation distance requirements if it was permitted or certified by KDHE or existed as a confined feeding facility on July 1, 1994. The presiding officer heard additional evidence and issued a report in 1995, finding that as of June 27, 1994, Meyer had one pen capable of permanent confinement that housed 40-50 head of cattle. The presiding officer ruled that Meyer's facility existed on July 1, 1994, and it was exempt from the separation distance requirements under K.S.A. 1994 Supp. 65-171d(k). 25 Kan. App. 2d at 124-25.

10

Ringler later filed suit directly against Meyer. Unlike the case-at-hand, however, Ringler did not take issue with KDHE's determination that Meyer's feeding facility was exempt from the separation distance requirements. Instead, Ringler argued that after Meyer received a permit from KDHE in 1995, it again expanded and that expansion was in violation of the separation distance requirements. In reviewing whether Ringler could file a direct action against Meyer, this court stated:

"Based on the allegations of the petition, plaintiff is not challenging the KDHE order; plaintiff is seeking to enjoin subsequent conduct which she alleges violates state law. Since plaintiff is not challenging KDHE's decision . . . that defendants' facility as of June 1, 1994, was exempt, plaintiff was not required to appeal from the KDHE presiding officer's order of June 1995." 25 Kan. App. 2d at 133.

Having found that Ringler could bring her suit, the question then became whether Meyer's subsequent conduct constituted an expansion, and if so, whether that expansion was exempt from the separation distance requirements. This court stated:

"KDHE found the defendants' facility to be exempt from the separation requirements of the statute as of July 1, 1994, and plaintiff does not contest that finding. The narrow issue is whether defendants have *expanded* their facility since July 1, 1994, and if so, whether K.S.A. 65-171d(k)(3)(B) exempts that expansion from the distance requirements." 25 Kan. App. 2d at 134.

Because Meyer's original facility was exempt from the separation distance requirements, this court explained that the subsequent expansion also would be exempt under the statute so long as the expansion did not reduce the distance between the facility and the nearest habitable structure prior to the expansion. 25 Kan. App. 2d at 136. This court ultimately remanded the case for a factual determination of whether the distance between the feedyard and the nearest habitable structure had decreased because of Meyer's expansion. 25 Kan. App. 2d at 137.

11

*Ringler* does not support Herd's claim that she can file a direct lawsuit against Shrauner based on KDHE's issuance of the 2012 expansion permit. Instead, *Ringler* makes it clear that the court only has jurisdiction over issues *not* resolved by the KDHE final order. If, for example, Shrauner allegedly violated the 2012 KDHE permit by having 3,000 head of cattle, rather than the 2,000 allowed under the permit, then under *Ringler*, Herd could bring a direct action against Shrauner. But Herd cannot sue Shrauner because of KDHE's decision to issue Shrauner a permit that Shrauner has never violated.

Herd herself has advocated for this position in her brief. At multiple points in her brief, Herd claims that this court has no jurisdiction over KDHE's prior orders because Shrauner failed to seek redress under the KJRA. But Herd fails to acknowledge that this argument applies equally to her own claims. If Herd takes issue with KDHE's finding that Shrauner's 2012 expansion was exempt from the separation distance requirements, then Herd's remedy is to address KDHE's actions under the KJRA—not to bring a direct lawsuit against Shrauner based on the actions of an administrative remedy.

This court has already held that Herd has standing to seek review of KDHE's decision to grant the 2012 permit to Shrauner. Herd has failed to pursue her petition for judicial review and until she takes that action, KDHE's administrative order remains final. Because Herd is not alleging that Shrauner has somehow violated the 2012 permit granted by KDHE for the expansion of Shrauner's facility, Herd has no basis for seeking declaratory and injunctive relief directly against Shrauner. Under these circumstances, appellate review is limited to consideration of the Estate's nuisance claim against Shrauner because the nuisance claim does not challenge any administrative order of the KDHE and is not subject to the KJRA.

12

## IS SHRAUNER'S 2012 EXPANSION EXEMPT FROM THE SEPARATION DISTANCE REQUIREMENTS?

Although we question our jurisdiction to review Herd's direct action against Shrauner for declaratory and injunctive relief arising from KDHE's issuance of the 2012 expansion permit, we will address the merits of Herd's arguments on appeal. Herd asked the district court to enjoin Shrauner from confining more than 999 head of cattle of any weight at any one time. Herd's reasoning for this request appears to be that KDHE should not have granted Shrauner a permit to expand to a 2,000 head facility because the expansion violated the separation distance requirements of K.S.A. 2016 Supp. 65-171d(j)(1). Thus, we must determine whether Shrauner's 2012 expansion violated the statutory separation distance requirements, and if so, whether the expansion falls within any of the exceptions set out in K.S.A. 2016 Supp. 65-171d(l)(1). Resolution of this issue is a question of statutory interpretation over which an appellate court has unlimited review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015).

The most fundamental rule of statutory interpretation is that the intent of the legislature governs if that intent can be ascertained. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016). To determine legislative intent, appellate courts look to the plain language of the statute, giving common words their ordinary meanings. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). If the statute is plain and unambiguous, an appellate court must refrain from speculating about the legislative intent behind that clear language and should not read something into the statute that is not readily found in its words. 304 Kan. at 409.

K.S.A. 2016 Supp. 65-171d(j)(1) states:

"Any new construction or new expansion of a confined feeding facility, other than a confined feeding facility for swine, shall meet or exceed the following

13

requirements in separation distances from any habitable structure in existence when the registration is received:

> (A) 1,320 feet for facilities with an animal unit capacity of 300 to 999; and

> (B) 4,000 feet for facilities with an animal unit capacity of 1,000 or more."

This subsection provides that any new construction or new expansion of a confined feeding facility with an animal unit capacity of 1,000 or more must meet the requirement of being at least 4,000 feet from any existing habitable structure. Shrauner is in violation of this statutory separation requirement because the Herd residence is only 2,567 feet from Shrauner's south pens. However, the statutes also states:

> "(l)(1) The separation distances required pursuant to subsection (j)(1) shall not apply to:

> (A) Confined feeding facilities which were permitted or certified by the secretary on July 1, 1994;

> (B) confined feeding facilities which existed on July 1, 1994, and registered with the secretary before July 1, 1996; or

> (C) expansion of a confined feeding facility, including any expansion for which an application was pending on July 1, 1994, if: (i) In the case of a facility with an animal unit capacity of 1,000 or more prior to July 1, 1994, the expansion is located at a distance not less than the distance between the facility and the nearest habitable structure prior to the expansion; or (ii) in the case of a facility with an animal unit capacity of less than 1,000 prior to July 1, 1994, the expansion is located at a distance not less than the distance between the facility and the nearest habitable structure prior to the expansion and the animal unit capacity of the facility after expansion does not exceed 2,000." K.S.A. 2016 Supp. 65-171d(l)(1).

The district court found that based on the uncontroverted facts, the 2012 expansion of Shrauner's facility was exempt under all three exceptions to the separation distance requirements. We will address all three exceptions; however, it is important to note that Shrauner only needs to meet the requirements of one exception to be exempt.

*Is the 2012 expansion exempt under K.S.A. 2016 Supp. 65-171d(l)(1)(A)?*

K.S.A. 2016 Supp. 65-171d(l)(1)(A) provides: "The separation distances required pursuant to subsection (j)(1) shall not apply to . . . [c]onfined feeding facilities which were permitted or certified by the secretary on July 1, 1994." KDHE issued Certifications of Compliance to Shrauner for the south pens in 1988 and for the east pens in 1990—although this certification was never signed. In issuing the 2012 expansion permit, KDHE acknowledged that the discrepancy in the legal description of the south pens was a mere clerical error, and KDHE specifically stated that it was aware of the location of the south pens as being in the northwest quarter of section 33. KDHE's finding that the discrepancy in the legal description was a mere clerical error has not been set aside.

Herd argues that Shrauner's confined feeding facility was not properly certified because Shrauner was not in compliance with the water pollution laws on July 1, 1994. Shrauner disagrees and claims that Herd's contentions regarding compliance are "immaterial, irrelevant, and wrong." Shrauner is correct; there is nothing in K.S.A. 2016 Supp. 65-171d(l)(1)(A) that expressly requires a confined feeding facility to be "in compliance with all water pollution laws" to qualify for the exemption. The undisputed evidence establishes that KDHE certified Shrauner's facility without identifying any significant water pollution potential in both 1988 and 1990. Herd is not permitted to challenge the validity of these certifications several years after the fact when Shrauner attempted to expand its confined feeding facility in 2012.

Moreover, there is no evidence in the record that Shrauner was ever noncompliant with the water pollution laws in 1994. From 1988 to 1990, each time KDHE inspected the feedyard, it found Shrauner in compliance with water pollution standards. In 1993, KDHE inspected the feedyard and reported that a federal permit was necessary because of the number of cattle at the facility and the number of days of confinement. This belief, however, was inaccurate as a NPDES permit is only necessary if a facility has a capacity

15

that exceeds the federal threshold and the facility discharges waste into waters of the United States. 33 U.S.C. § 1311(a) (2012). Because KDHE determined that Shrauner feedyard did not discharge waste into Bluff Creek, a federal permit was not necessary.

Thus, Shrauner's facility, as it existed *prior* to the 2012 expansion, was exempt from the separation distance requirements under K.S.A. 2016 Supp. 65-171d(l)(1)(A) because it was certified on July 1, 1994. The complicating factor here, however, is that Herd takes issue with the 2012 expansion of Shrauner's facilities—not the original construction of the south pens in 1987 and the east pens in 1990. The district court found that K.S.A. 2016 Supp. 65-171d(l)(1)(A) applied to expansions of feedyards that were permitted or certified on July 1, 1994. The district court then found that under this exception, Shrauner's "facilities can expand in any direction and to any size." The district court's interpretation of K.S.A. 2016 Supp. 65-171d(l)(1)(A)'s exception is flawed.

Under the plain language of the statute, the subsection (l)(1)(A) exception applies only to confined feeding facilities certified on July 1, 1994; this means that a facility certified by that date does not need to adhere to the separation distance requirements in K.S.A. 2016 Supp. 65-171d(j)(1). However, there is nothing in the statute that indicates the legislature also intended *expansions* to be exempt under this provision; this conclusion is bolstered by the fact that the legislature saw fit to expressly create a provision for expansions of exempt facilities in subsection (l)(1)(C).

This court agreed with this interpretation of the statutory exceptions to the separation distance requirements in *Ringler.* Although *Ringler* discussed the exception in what is now subsection (l)(1)(B), the reasoning applies equally to the subsection (l)(1)(A) exception. In *Ringler*, Meyer tried to argue that because its facility existed on July 1, 1994, its subsequent expansion in 1995 was not subject to the separation distance requirements under the statute. This court rejected the argument, finding that only K.S.A.

16

1994 Supp. 65-171d(k)(3), now found in subsection (l)(1)(C), applies to expansions of already exempt facilities. 25 Kan. App. 2d at 135. Specifically, the court stated:

> "The K.S.A. 1994 Supp. 65-171d(k)(2) [now subsection (l)(1)(B)] exemption applies only to facilities 'which exist' on July 1, 1994, the effective date of the act. The statute also specifically provides for an additional exemption for 'expansion' of exempt facilities. It is thus clear the legislature intended to provide an exemption for facilities *existing* as of July 1, 1994. This cannot reasonably be interpreted to exempt facilities which were *planned* but not in existence on that date. To interpret the statute to exempt 'planned' expansions would totally negate the 'expansion' provision of K.S.A. 1994 Supp. 65-171d(i)and (k)(3) [now subsection (l)(1)(C)]." 25 Kan. App. 2d at 136-37.

Thus, while Shrauner's facility as it existed prior to 2012 was exempt from the separation distance requirements under subsection (l)(1)(A), the 2012 expansion is not exempt under that subsection; instead, to be exempt from the separation requirements, Shrauner's expansion must meet the requirements of subsection (l)(1)(C), which governs expansions of already exempt facilities. As we will explain, however, whether Shrauner's facility was exempt under subsection (l)(1)(A) prior to the 2012 expansion is relevant to the applicability of the exception for expansions in subsection (l)(1)(C).

*Is the 2012 expansion exempt under K.S.A. 2016 Supp. 65-171d(l)(1)(B)?*

K.S.A. 2016 Supp. 65-171d(l)(1)(B) exempts from the separation distance requirements "confined feeding facilities which existed on July 1, 1994, and registered with the secretary before July 1, 1996." The difference between this exception and the exception in subsection (l)(1)(A) is that unlike the (l)(1)(A) exception, which only requires the facility to be permitted or certified by the secretary on July 1, 1994, the subsection (l)(1)(B) exception requires that the facility actually existed on July 1, 1994, and affords a 2-year grace period within which it must be registered. See *Ringler*, 25 Kan.

17

App. 2d at 136-37. Shrauner's facility, as it existed *prior* to 2012, was exempt under this exception because it existed on July 1, 1994, and was registered before July 1, 1996.

*The facility existed on July 1, 1994*

Herd attempts to argue that because the legal description of the pre-2012 facilities in the Certifications of Compliance mistakenly listed the south pens' location as the northeast quarter of section 33, the pens did not "exist" until the mistake was corrected in the 2012 Certification of Compliance. But as Shrauner argues, the legal descriptions in the Certifications of Compliance are immaterial and irrelevant to whether Shrauner's facility existed on July 1, 1994, as required by K.S.A. 2016 Supp. 65-171d(l)(1)(B). This court in *Ringler* explained that for the purposes of this exception to the separation distance requirements, "existed" means that the facilities were completed and capable of permanent confinement on July 1, 1994. 25 Kan. App. 2d at 136. The south pens were completed and capable of permanent confinement in 1987, and the east pens were completed by 1991. Thus, Shrauner's facility existed on July 1, 1994.

Herd again attempts to argue that Shrauner's confined feeding facility did not exist until 2012 because Shrauner was not in compliance with the water pollution laws on July 1, 1994. This argument fails for the same reasons we previously discussed. Herd is attempting to add a requirement to subsection (l)(1)(B) that is not found in the statutory language. Finally, although Shrauner's compliance with water pollution laws has no bearing on whether the facility existed on July 1, 1994, there is no evidence in the record that Shrauner was ever noncompliant with the water pollution laws.

*The facility was registered by July 1, 1996*

Shrauner's facility was also registered by July 1, 1996, as required by K.S.A. 2016 Supp. 65-171d(l)(1)(B). K.S.A. 2016 Supp. 65-171d(g)(1), (3) provides:

18

"(1) Prior to any new construction of a confined feeding facility with an animal unit capacity of 300 or more, such facility shall register with the secretary of health and environment. Such registration shall be accompanied by a $25 fee. . . .

. . . .

"(3) Within 30 days of receipt of such registration, the department of health and environment shall identify any significant water pollution potential or separation distance violations pursuant to subsection (j)."

Accordingly, a facility is registered within the meaning of the statute when it submits a registration application to KDHE prior to any new construction. Thus, Shrauner's south pens were registered in 1987 when it submitted its registration application for the addition of the south pens. Likewise, the east pens were registered in 1990. KDHE acknowledged receipt of both the registration application for the south pens as well as the registration application for the east pens.

Thus, Shrauner's facility, as it existed prior to the 2012 expansion, was exempt from the separation distance requirements under the exception at K.S.A. 2016 Supp. 65-171d(l)(1)(B). For the reasons we discussed above, the district court incorrectly found that this exception applied to Shrauner's 2012 expansion. Instead, to be exempt from the separation distance requirements, Shrauner's expansion must meet the requirements of subsection (l)(1)(C), which specifically governs expansions of already exempt facilities.

*Is the 2012 expansion exempt under K.S.A. 2016 Supp. 65-171d(l)(1)(C)?*

Shrauner's animal unit capacity before July 1, 1994, was either 1,500 per the 1988 Certification of Compliance or 2,000 per the unsigned 1990 Certification of Compliance. Based on this number of cattle, K.S.A. 2016 Supp. 65-171d(l)(1)(C)(i) exempts Shrauner's 2012 expansion so long as "the expansion is located at a distance not less than the distance between the facility and the nearest habitable structure prior to the expansion." In *Ringler*, this court construed this exception to apply to the expansion of

19

already exempt facilities provided that the expansion does not result in the facility being closer in distance to the nearest habitable structure than it was prior to the expansion. See 25 Kan. App. 2d at 136. Shrauner's 2012 expansion meets these requirements.

First, Shrauner's confined feeding facility prior to the 2012 expansion was exempt under both K.S.A. 2016 Supp. 65-171d(l)(1)(A) and (B). Both the south and the east pens were certified before July 1, 1994. Herd stresses the fact that the Certification of Compliance for the addition of the east pens was never signed. But it does not matter for the purposes of whether the 2012 expansion was exempt that the 1990 Certification of Compliance was unsigned. Even if, *arguendo*, the east pens were not actually certified by 1994, Shrauner's 2012 expansion still meets the requirements of the subsection (l)(1)(C) exception. To be exempt under subsection (l)(1)(C), Shrauner's facility prior to the expansion had to be exempt under either subsection (l)(1)(A) or (B); clearly, the south pens were certified by 1988 and were exempt under subsection (l)(1)(A). The closest facility to the Herd residence has always been the south pens, so whether the east pens were also exempt does not actually matter for purposes of this appeal. Regardless, both the south and east pens existed on July 1, 1994, and were registered before July 1, 1996, and were therefore exempt under subsection (l)(1)(B).

Second, the 2012 expansion did not decrease the distance between Shrauner's facilities and the Herd residence. The closest Shrauner facility to the Herd residence are the south pens, which were built in 1987. The 2012 expansion added a waste storage pond on the east side of the facility that was further away from the Herd residence. Herd argues that although Shrauner's physical expansion was not closer to her residence, the increase in cattle from 950 head to 2,000 head constituted a "regulatory expansion" that moved the facility closer to Herd's residence. It is unclear exactly what Herd means by "regulatory expansion"; presumably she means that because of the increase in cattle, the nuisance-like effects of such a large number of animals are now felt more acutely at the Herd residence than they were when the facility only confined 950 head of cattle.

20

While this assertion may be true, it does not preclude Shrauner's 2012 expansion from being exempt under K.S.A. 2016 Supp. 65-171d(l)(1)(C). It is undisputed that when Shrauner increased its capacity to 2,000 head of cattle and built the water pollution control system, it expanded its facility. The question is whether the expansion is located at a "*distance* not less than the distance between the facility and the nearest habitable structure prior to the expansion." (Emphasis added.) K.S.A. 2016 Supp. 65-171d(l)(1)(A)(i). When interpreting statutes, courts are to give common words their ordinary meanings. *Ullery*, 304 Kan. at 409. The common meaning of the term "distance" implies the need for a physical unit of measurement to determine whether the actual facility is closer to the nearest habitable structure. As the court stated in *Ringler*:

"[T]he distance differences must be based on the actual facility in existence on July 1, 1994, as compared to the facility as it presently exists. . . . To determine whether the distance has decreased, the [court] must ultimately determine whether the additional pens, lagoons, etc., are closer to the plaintiff's dwelling than the original pen and runways existing on July 1, 1994. This is the only reasonable way to interpret the expansion provision of the statute." 25 Kan. App. 2d at 137.

Clearly then, when determining whether an expansion of a confined feeding facility has moved closer to a dwelling, courts are to compare the measureable distances between physical structures rather than, as Herd argues, to compare the nuisance-like conditions before and after the expansion. Whether Shrauner's 2012 expansion moved the facilities closer to the Herd residence depends on whether the expanded facilities are closer to the Herd residence than the facilities that existed before the expansion. They are not; before the expansion the closest facility to the Herd residence was the south pens, which were built in 1987. The 2012 expansion including the waste storage pond moved the facility further away from the Herd residence than before the expansion.

Herd claims that the runoff diversion channel built in 2012 is actually closer to her property than the south pens as they existed prior to 2012. This assertion may be true;

21

Shrauner's NPDES permit shows that the runoff diversion channel was built along the south boundary of the south pens and draws runoff into the waste storage pond. The flaw in Herd's argument, however, is that the separation distance requirements only apply to a "confined feeding facility." See K.S.A. 2016 Supp. 65-171d(j)(1). K.S.A. 2016 Supp. 65-171d(c)(2) defines "[c]onfined feeding facility" as "any lot, pen, pool or pond . . . [w]hich is used for the confined feeding of animals or fowl for food." Thus, because the runoff diversion channel is not a "confined feeding facility," it is not subject to the separation requirements and the fact that it may be closer to the Herd residence does not matter. Shrauner's 2012 expansion is exempt under K.S.A. 2016 Supp. 65-171d(l)(1)(C) because the only additional "confined feeding facility" was the waste storage pond, and the pond is located further away from the Herd residence than the south pens built in 1987.

To sum up, Shrauner's 2012 expansion is exempt from statutory separation distance requirements under the exception found at K.S.A. 2016 Supp. 65-171d(l)(1)(C). Shrauner's confined feeding facility prior to the 2012 expansion already was exempt from the separation distance requirements under subsections (l)(1)(A) and (B). Furthermore, the 2012 expansion did not result in Shrauner's confined feeding facility being closer to the Herd residence than it was prior to the expansion; after the expansion, the closest Shrauner facility to the Herd residence remained the south pens built in 1987. Based on the exception in K.S.A. 2016 Supp. 65-171d(l)(1)(C), the district court did not err in finding that Shrauner's 2012 expansion was exempt from the statutory separation distance requirements. See *Gannon v. State*, 302 Kan. 739, 744, 357 P.3d 873 (2015) (if district court reaches the correct result, its decision will be upheld even though it relied upon the wrong ground or assigned erroneous reasons for its decision).

DOES THE ESTATE'S NUISANCE CLAIM FAIL AS A MATTER OF LAW?

Finally, Herd claims that the district court erred when it ruled that the Estate's nuisance action failed as a matter of law. Herd acknowledges that the cemetery is a public

place, but she argues that "public nuisance can be grounds for a private nuisance claim" if an injured citizen has sustained an injury from a public nuisance that differs from that sustained by the community in general. Herd then claims that Hern's ownership of lot 48—in which he is buried—in the Protection Township Cemetery is a property right or interest sufficient for a private nuisance claim; and because the "stench, dust and noise" of Shrauner's feedyard "cause 'distinguishable and particularized' injury to the comfortable rights as a cemetery lot owner," the Estate has a legitimate nuisance claim. Accordingly, Herd asks this court to "reinstate the nuisance claim" and remand to the district court for adjudication on the merits.

Shrauner argues that the Estate cannot maintain a nuisance action on Hern's behalf because it did not exist at his death, and even if it did, a nuisance action abates when the claimant dies. Furthermore, Shrauner contends that the Estate cannot bring a private nuisance claim because it has no property rights in lot 48 other than Hern's right to be buried in it and the alleged nuisance conditions do not interfere with Hern's right to be buried in his plot. Shrauner further argues that the Estate cannot bring a public nuisance claim because the cemetery is public property and the alleged nuisance conditions apply equally to the general public. Thus, Shrauner concludes the district court correctly ruled that the Estate has no cause of action against Shrauner under a nuisance theory.

The district court granted Shrauner's motion for summary judgment as a matter of law on the Estate's nuisance claims. When no factual dispute exists, appellate review of the district court's summary judgment order is de novo. *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013).

The Estate cannot establish a private nuisance as a matter of law. "'A nuisance is an annoyance, and any use of property by one which gives offense to or endangers life or health, violates the laws of decency, pollutes the air with foul, noxious odors or smoke, or obstructs the reasonable and comfortable use and enjoyment of the property of another

23

may be said to be a nuisance.'" *Culwell v. Abbott Construction Co.,* 211 Kan. 359, 362, 506 P.2d 1191 (1973). As explained by the Kansas Supreme Court in *Culwell*:

> "Private nuisance historically has been and is a tort related to an unlawful interference with a person's use or enjoyment of his land. The concept of private nuisance does not exist apart from the interest of the landowner. Hence, a private nuisance is a civil wrong, based on a disturbance of some right or interest in land. The remedy for it lies in the hands of the individual landowner whose rights have been disturbed." 211 Kan. at 362.

Thus, the remedy for any alleged private nuisance here lies with Hern as the owner of lot 48—but Hern is deceased. The Estate cannot bring a nuisance claim on Hern's behalf because "'[a] cause of action does not survive in favor of a personal representative of a decedent *unless it accrued in favor of the decedent in his lifetime.*'" *Jeanes v. Bank of America,* 296 Kan. 870, 880, 295 P.3d 1045 (2013). Hern died in 2006, but the Estate brought the nuisance claim in 2014 based on the expansion of Shrauner's facility in 2012. Thus, the nuisance claim did not accrue in Hern's lifetime.

Moreover, there is no land interest here upon which the Estate can base a private nuisance claim. "'"When a tract of land has been dedicated as a cemetery, it is perpetually devoted to the burial of the dead and may not be appropriated for any other purpose . . . . [T]he property in question can only be used as a place for burying the dead."'" *Lower v. Board of Dir. of Haskell County Cemetery Dist.*, 274 Kan. 735, 740, 56 P.3d 235 (2002). The owner of a cemetery lot acquires only a limited property interest to be buried in that plot. *Earhart v. Holbert*, 116 Kan. 487, 488, 227 Pac. 351 (1924). Thus, while the owner can protect his right to be buried in a cemetery plot, once burial occurs the plot-owner's property interest terminates. Because Hern was buried in lot 48 in 2006, any property interest in the plot terminated and the Estate cannot establish a private nuisance claim.

Likewise, the Estate cannot establish a public nuisance action as a matter of law. "'A public nuisance is an unreasonable interference with a right common to the general

public.'" *State ex rel. Graeber v. Marion County Landfill, Inc.*, 276 Kan. 328, 342, 76 P.3d 1000 (2003). While a private nuisance affects an individual landowner, a public nuisance annoys an entire community. 276 Kan. at 342. Private individuals, however, cannot bring a public nuisance action unless the private individual's alleged harm is distinguishable from that suffered by the general public:

> "Today it is uniformly held that a private individual has no action for the invasion of a purely public right, unless his damage is in some way to be distinguished from that sustained by other members of the general public. It is not enough that he suffers the same inconvenience or is exposed to the same threatened injury as everyone else. In the absence of some peculiar individual injury redress for a public nuisance must be left to the appointed representatives of the community." *Culwell*, 211 Kan. at 363-64.

Here, the Estate has alleged no harm that it has suffered due to Shrauner's facility other than an increase in insects and foul odors; this is no different than the harm suffered by any member of the general public who visits the Protection Township Cemetery. The Kansas Supreme Court has also held that a private individual can bring a public nuisance claim if the public nuisance interferes with the individual landowner's enjoyment of the land. *Culwell*, 211 Kan. at 364. But as previously explained, the limited property interest Hern had in his burial plot terminated at his death. Thus, the Estate cannot sustain a nuisance claim—neither public nor private. The district court correctly concluded that the Estate's nuisance claim failed as a matter of law.

Affirmed.